## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

MAXWELL G. TODHUNTER,

       Plaintiff,

v.                                      Case No. 05-CV-74934

JEFF SWAN and CHRIS PARASKI,

       Defendants.

_____/

### OPINION AND ORDER GRANTING DEFENDANTS'
### "MOTION FOR SUMMARY JUDGMENT"

This is a Fourth Amendment claim, brought under 28 USC § 1983, in which Plaintiff asserts that Defendant Jeff Swan, a Macomb County Deputy Sheriff, after arresting him used unconstitutionally excessive force in getting him fully into the back seat of the deputies' patrol car.  Unfortunately, because of an unusual leg deformation unknown to Deputy Swan, a major bone in Plaintiff's leg was broken in the course of the deputy pushing Plaintiff further into the back seat beside Plaintiff's two companions. Plaintiff asserts that Deputy Paraski is liable in tort for not intervening. Defendants' "Motion for Summary Judgment" is now before the court. The matter has been fully briefed and the court concludes that a hearing is unnecessary.  *See* E.D. Mich. LR 7.1(e)(2).  For the reasons stated below, the court will grant Defendants' motion.

### I.  FACTUAL BACKGROUND

Plaintiff's claims are asserted in part under 28 U.S.C. § 1983 for excessive force after a traffic stop on a country road resulted in three arrests, including Plaintiff. The facts that follow are not disputed, except where indicated. As a young child, Plaintiff was

involved in a car accident and injured the growth plate in his left leg.  (Pl.'s Dep. at 12, Pl.'s Ex. 5.)  Several years later, with his left leg having developed to be somewhat shorter than his right, Plaintiff began undergoing a number of medical procedures, including surgery, to lengthen his left femur.  (Doctor's Report, Pl.'s Ex. 1.)  The new bone that grows, according to Plaintiff's doctor, is weak because it has less compressive or tensile strength than that of "normal bone."  (Zaltz Dep. at 13-14, Defs' Ex. C.)  The incident in question happened about two months after Plaintiff underwent his most recent surgical procedure of this kind.  (Pl.'s Dep. at 65-66.)

On September 11, 2004 shortly before midnight, the seventeen-year-old Plaintiff was riding around in a Jeep smoking marijuana and drinking beer with two friends, Jameson Fortuna--the driver--and Bryan Sanchez--the back seat passenger--when police pulled the car over for speeding.  (Police Report, Pl.'s Ex. 2.)  Defendants Jeff Swan and Chris Paraski, deputies of the Macomb County Sheriff, approached the car and smelled alcohol.  (*Id.*)  Paraski spoke with Fortuna while Swan approached Plaintiff, who was seated in front.  (*Id.*)  Swan observed two open beer cans on the floorboard under Plaintiff's feet.  (*Id.*)  Fortuna stated that he was the designated driver and Plaintiff and Sanchez admitted that they were drinking the beer.  (*Id.*)  Defendants asked all three to get out of the vehicle.  (*Id.*)  Swan's report, which Plaintiff does not dispute, indicates that Sanchez and Plaintiff tested positive on a Preliminary Breath Test device for alcohol.  (*Id.*)

2

In his deposition, Plaintiff recounted from his point of view the following sequence of events.[1]  Swan approached Plaintiff on the passenger side of the car and asked if Plaintiff had been drinking.  (Pl.'s Dep. at 36.)  Plaintiff responded that he had, and Swan asked him to step out of the car.  (*Id.*)  Plaintiff and Sanchez got out on the passenger's side while Fortuna stepped out and spoke with Paraski on the driver's side.  (*Id.* at 37-39.)  Paraski gave Fortuna a sobriety test.  (*Id.* at 38.)  Defendants searched the car and found "one or two grams" of marijuana in the back seat.  (*Id.* at 39-40.)  The three men initially lied, denying any knowledge of the marijuana.  Defendants handcuffed Fortuna and Sanchez at the side of Fortuna's car.  (*Id.* at 39-40, 42.)  Eventually, the three admitted that the marijuana "was all of ours."  (*Id.* at 41.)  Defendants escorted the three to the police car.  (*Id.* at 41.)  Plaintiff walked with a limp that should have been obvious to an observer.  (*Id.* at 79.)  Neither Defendant asked Plaintiff what was wrong or why he was limping, nor did Plaintiff say anything about it.  (*Id.* at 104.)  Defendants placed Fortuna in the rear seat behind the driver's seat of the police car, Sanchez in the middle rear seat and Plaintiff in the rear seat behind the front passenger's seat.  (*Id.* at 41.)

Plaintiff was "halfway in the car" with "my legs out" when Swan asked him and Sanchez to take preliminary breath tests, and they complied.  (*Id.* at 44-45, 47.)  After the test, Swan told Plaintiff to get in the car.  (*Id.* at 48.)  Plaintiff stood up and put his left leg in the car.  (*Id.* at 49-50.)  Plaintiff was unable to bend his left leg sufficiently to

---

[1]The court will, pursuant to Federal Rule of Civil Procedure 56, view the facts in the light most favorable to Plaintiff as the nonmoving party and will therefore rely primarily on his account.  Furthermore, both Defendants disavowed any specific recollection of these events beyond what they read in the police report in preparation for their depositions.  (Swan Dep. at 8-9, Defs.' Ex. B; Paraski Dep. at 8, Defs.' Ex. D.)

get all the way in the back seat as the lower part of the protective partition in the police car behind front seat "was too close."   (*Id.* at 50.)[2]

As Plaintiff was attempting to sit in the back seat, and as he was about halfway in, (*id.* at 50), he told Swan, (*id.* at 51) as Swan was shutting the door,[3] (*id.* at 103), that Plaintiff "didn't think I could fit because of my leg," (*id.* at 48-49).   At this point, Plaintiff had his left leg in the car up against the partition with his left hip on the seat and his right leg straddling out the door.   (*Id.* at 51-52.)   Swan did not ask Plaintiff what was wrong with his leg; Plaintiff did not elaborate.   (*Id.* at 52.)   Instead, Swan used both his hands to push Plaintiff in the back seat. Swan used "force" (*Id.* at 52) to do so.[4] Sanchez at the time was "as far over as he could get" to make room for Plaintiff.   (*Id.* at 58.)

It took about four or five seconds for Plaintiff to verbalize his trouble getting in "because of [his] leg," and for Swan to push Plaintiff into the seat.   (*Id.* at 97.)   Plaintiff stated that Swan "just pushed me" . . . "[t]o slide me over." (*Id.* at 54.)   Plaintiff testified that Swan was not attempting to hurt him or to physically injure him with the push.   (*Id.*)   Plaintiff said that Swan made a noise like a sigh, or otherwise voiced what Plaintiff viewed as disgust with a "[t]ch, like a 'huh'" just before pushing him.   (*Id.* at 102, 104.)   For that reason, Plaintiff responded affirmatively when asked if he thought Swan was,

---

[2]Plaintiff's doctor averred that, "unless it was excessively cramped[,]" someone in Plaintiff's condition should be able to sit in the back seat of a car but that the knee joint would have to be moved "more deliberately and carefully."   (Zaltz Dep. at 29-30.)

[3]Sanchez avers that Swan swung (but did not slam) the door, which bounced back off of Plaintiff.   (Sanchez Dep. at 23, Pl.'s Ex. 6.)

[4]Sanchez states that he could feel the push when Plaintiff's whole body moved and hit Sanchez's thighs and that Swan "shoved [Plaintiff] kind of."   (*Id.* at 25.)

according to the words of Plaintiff's attorney, "being a jerk about it." (*Id.* at 103.) Swan did not shrug his shoulders or make any particular facial expressions towards Plaintiff. (*Id.* at 102.) Sanchez also states that Swan at no point treated Plaintiff angrily. (Sanchez Dep. at 26, Pl.'s Ex. 6.)

In the course of Swan pushing Plaintiff into the seat, Plaintiff's left foot or leg caught on the transmission hump on the floor in the car and Plaintiff's femur "just snapped . . . down by the knee." (Pl.'s Dep. at 54.) He felt an immediate "warm tingling and stabbing feeling." (*Id.*) Swan then sat in the front passenger seat and Plaintiff waited "about a minute" before he asked three times to exit the car. (*Id.* at 55-57.) After the third time, Plaintiff stated, "I think there is something wrong with my leg. It might be broke [sic]." (*Id.* at 56.) Swan, who did not respond[5] the first two times, then told Plaintiff that Swan would let Plaintiff out once Plaintiff was wearing handcuffs. (*Id.* at 56-57.) Swan came back, opened Plaintiff's door, told Plaintiff to extend his arms, and then Swan placed handcuffs on Plaintiff. (*Id.* at 58-59.)[6] Swan did not, however, permit Plaintiff to exit and instead "[c]losed the door and we went to jail." (*Id.* at 59.) Plaintiff and Sanchez continued to complain about Plaintiff's leg during the ride to jail, which lasted twenty or twenty-five minutes. (*Id.*)[7]

---

[5]Sanchez states that, as soon as the car began moving, Defendants turned on the radio and had it at a volume where one "could say something and not be heard." (*Id.* at 47.)

[6]Sanchez, meanwhile, avers that Plaintiff was handcuffed when Swan first tried shutting the door on Plaintiff. (*Id.* at 26.)

[7]Sanchez, on the other hand, claims that only Plaintiff made comments on the way to jail. (*Id.* at 29.)

After his release and as a result of the fracture, Plaintiff sought medical care and underwent additional surgery.  (Doctor's Report, Pl.'s Ex. 1; Zaltz Dep. at 25.)  Plaintiff's fracture was located in the regenerate, or new bone.  (Zaltz Dep. at 13.)

## II.  PROCEDURAL BACKGROUND

Plaintiff filed suit on December 30, 2005, subsequently amending his complaint to assert claims of excessive force in violation of the Fourth Amendment (Count I), medical indifference (Count II), concert of action (Count III) and gross negligence (Count IV).  (Pl.'s Second Am. Compl.)[8]  Defendants moved for summary judgment on October 2, 2006.  They contend that the claim of excessive force should fail because Swan used minimal force and acted reasonably under the circumstances and because Paraski had no physical contact with Plaintiff nor any knowledge of the condition of Plaintiff's leg.  (Defs.' Br. at 8-10.)  For the same reasons, Defendants request summary judgment for Plaintiff's claim of gross negligence under Michigan state law. (*Id.* at 10-12.)  Plaintiff responds that summary judgment is inappropriate because there are genuine issues of fact regarding whether Defendants' action (or inaction, depending on the Defendant) was reasonable.  (Pl's Br. at 18-21.)  Plaintiff further argues that his claim of gross negligence should proceed because Swan acted in a manner that was so reckless as to demonstrate a substantial lack of concern for whether an injury resulted, and because Paraski took no action to deter Swan.  (*Id.* at 22.)  For the reasons stated below, the court will grant Defendants' motion.

---

[8]The parties filed an order stipulating that Counts II and III are dismissed without prejudice.  (11/27/06 Consent Order.)  The court's opinion and order will therefore only address Counts I (excessive force) and IV (gross negligence).

### III.  STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment is proper when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  "Where the moving party has carried its burden of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits in the record construed favorably to the non-moving party, do not raise a genuine issue of material fact for trial, entry of summary judgment is appropriate."  *Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir. 1987) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)).

Summary judgment is not appropriate when "the evidence presents a sufficient disagreement to require submission to a jury."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  The existence of some factual dispute, however, does not defeat a properly supported motion for summary judgment; the disputed factual issue must be material.  *See id.* at 252 ("The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict-'whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed.'").  A fact is "material" for purposes of summary judgment when proof of that fact would have the effect of establishing or refuting an essential element of the claim or a defense advanced by either party.  *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984).

In considering a motion for summary judgment, the court must view the facts and draw all reasonable inferences from those facts in a manner most favorable to the

7

nonmoving party.  *Wexler v. White's Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003)

(citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)).

The court is not to weigh the evidence to determine the truth of the matter, but must

determine if there is a genuine issue for trial.  *Sagan v. United States*, 342 F.3d 493,

497 (6th Cir. 2003).

## IV.  DISCUSSION

### A.  Excessive Force under § 1983

Defendants claim there was no excessive force, and, alternatively, that they are

entitled to qualified immunity.  To evaluate that claim, the court must first decide

whether, taking the facts in a light most favorable to Plaintiff, Defendants' conduct

violated a constitutional right.  *Saucier v. Katz*, 533 U.S. 194, 201-02 (2001).  If yes, the

next step is to determine whether that right was clearly established.  *Id.*  If there was no

constitutional violation, there is no reason to apply qualified immunity analysis.  *Id.* at

121 ("If no constitutional right would have been violated were the allegations

established, there is no necessity for further inquiries concerning qualified immunity.")

Plaintiff alleges that his Fourth Amendment rights were violated.  The Fourth

Amendment guarantees that "[t]he right of the people to be secure in their persons . . .

against unreasonable searches and seizures, shall not be violated . . . ."  U.S. Const.

amend IV.  The reasonableness of a seizure depends on when it is made and how it is

carried out.  *Graham v. Connor*, 490 U.S. 386, 395 (1989).  Under 42 U.S.C. § 1983,

excessive force used to effectuate an arrest can result in civil liability.  *Id.*  "[A]n arrest

need not be an assault for it to be actionable under § 1983.  *St. John v. Hickey*, 411

F.3d 762, 771 (6th Cir. 2005) (citing *Burchett v. Kiefer*, 310 F.3d 937, 946 (6th Cir.

8

2002)).  The touchstone is instead the reasonableness of the arresting officers' actions.
*Id.*  "[T]he 'reasonableness inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."  *Graham*, 490 U.S. at 397.

Most commonly, excessive force claims arise based upon the force used in taking the person into physical custody.  Accordingly, proper application of the reasonableness inquiry ordinarily "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  *Id.* at 396 (citation omitted).  These factors, aimed primarily at analyzing the force used preceding physical custody, are not an exhaustive list because the ultimate question is "whether the totality of the circumstances justifies a particular sort of seizure."  *Id.*  The court balances the nature of the intrusion on the arrestee's Fourth Amendment rights against the government's countervailing interests that are at stake.  *Id.*  The Sixth Circuit has stated that this standard "contains a built-in measure of deference to the officer's on-the-spot judgment about the level of force necessary in light of the circumstances of the particular case."  *Burchett*, 310 F.3d at 944.

Application of the above standard to the facts of this case results in no question of material fact concerning the reasonableness of Defendants' actions.  Plaintiff's evidence does not support his argument that Defendants acted unreasonably.

9

First, it is uncontested that Defendants detected the odor of alcohol when they approached Plaintiff and his friends, and saw open beer cans at the feet of both Plaintiff and Sanchez. There is no dispute that Plaintiff and Sanchez told Defendants that they had been drinking beer, and no dispute that the deputies acted properly in testing the assertion of alcohol consumption with the PBT device.

At this point, it is indisputable that Defendants had sufficient reasons to order the three young men out of the car and to search their persons and vehicle.  Plaintiff does not dispute that there was probable cause to arrest him for the being a minor in possession of alcohol.  (Pl.'s Br. at 18.)  Furthermore, the search of the car produced a small, usable amount of marijuana, which, Plaintiff concedes, created additional probable cause to arrest him for misdemeanor possession of marijuana.  (*Id.*)  However, Plaintiff cites *Kostrzewa v. City of Troy*, 247 F.3d 633 (6th Cir 2001), for the proposition that "there is no dispute that the crime for which plaintiff was arrested was of a minor nature, that he did not pose an immediate threat to the safety of the officers or others, and was not actively resisting arrest or attempting to evade arrest by flight."  (Pl.'s Br. at 18.)  The court agrees that the record contains no evidence suggesting that Plaintiff actively resisted arrest or attempted to flee.  Kostrzewa was arrested for making an illegal left-hand turn, driving on a suspended license, and having a civil warrant for failure to pay child support.  247 F.3d at 637.  That case, however, teaches a different lesson.  The Court of Appeals reversed the district court's Rule 12(b)(6) dismissal, holding that Kostrzewa's allegation that "the defendants drove recklessly with the plaintiff handcuffed in the back seat so as to cause him further pain and injury, [ ], by

10

itself, is enough to state a claim upon which a reasonable factfinder could conclude that the officers used excessive force." *Id.* at 639

In addition to the obvious difference between a Rule 12(b)(6) analysis, which accepts as true every fact alleged in the complaint, and a Rule 56 analysis, where the non-moving party must produce actual admissible evidence, the allegations in Kostrzewa's complaint attribute distinctly malicious acts to the officers, acts that are therefore considerably more severe than the actions in that Plaintiff has testified the Defendants engaged in here.  First, from this vehicle containing three young men, open beer cans and marijuana, Defendants made a custodial arrest for felony drug possession of the driver, Fortuna, who had one or more prior drug convictions, (Incident Report, Pl.'s  Resp. Ex. 2), and custodial arrests--for obviously non-violent offenses--of the passengers as well.  The Jeep was impounded.  *Id.*  The arrests were made near midnight on a rural roadway.  *Id.*

The situation presented to the deputies here was at least marginally more serious than was Kostrzewa's illegal turn, civil warrant and suspended license.  Even a casual observer without the experience of trained police officers would sense a level of potential danger hovering over Plaintiff's situation.  Defendants thus had a legitimate interest in securing Plaintiff and his friends and escorting them to jail.

The serious and vulnerable condition of Plaintiff's femur, meanwhile, was neither known to Defendants, nor was it apparent.  Plaintiff was supposed to have been using a cane, but chose to not do so, (Zaltz dep at 19, 27-29, Defs' Ex. C.) and was able to walk unassisted. He did walk with a noticeable limp, but the nature of Plaintiff's limp was not such as to communicate to objectively reasonable officers in the position of these

11

Defendants that Plaintiff had recently undergone something as serious as leg-lengthening surgery, or that a part of his left femur was weakened by that procedure. People may walk with a limp for myriad numbers of reasons, most of which (if not all) seem much more foreseeable than the kind of serious orthopaedic surgery involved here, e.g., some inequality of leg length, temporary ligament or cartilage injury, muscle sprains or soreness, or even having a stone in one's shoe. Common experience dictates that the most likely reason for difficulty in ambulation under circumstances such as those involved in this case is the most simple: some degree of alcohol or drug intoxication.[9]

Without viewing this fact in isolation, the court is not persuaded that Plaintiff's unexplained limp was such as to communicate to objectively reasonable officers either the presence or the seriousness of Plaintiff's medical condition. Furthermore, the court cannot reasonably expect two officers to attach such significance to every nuance of a person's gait while at the same time investigating intoxication, searching and keeping track of two other youths and the car, all while on the side of a country[10] road at about

---

[9] The court recognizes that when questioned at his deposition Plaintiff testified that he had consumed "four or five beers." (Pl.'s Dep. at 30.) On the night in question he told the deputies that he had consumed "about four" beers in addition to smoking marijuana. (Police Report, Pl's Ex. 2.) Plaintiff, in response to a question from his attorney at deposition, said that he did not "feel" that he was "drunk or intoxicated." (Pl.'s Dep. at 33.) The court observes, first, that this testimony is in the form of an opinion, and, second, that a seventeen-year-old with five beers and an unknown quantity of marijuana under his belt may not have been in the very best position to opine as to his own sobriety. The admissibility of a party's opinion in such circumstances is unclear.

[10]The police report indicates a location of the intersection of "30 Mile Road" with "Campground" which is a rural road in northern Macomb County. (Pl's Ex. 2.)

midnight.  Although Plaintiff never offered and Defendants never asked why he limped,

the court is unaware of any legal duty that would have required Defendants to ask.

At the door of the police car, Plaintiff also said nothing of his medical condition.

While halfway in the car and attempting to get in, he merely said he "didn't think I could

fit because of my leg."  (Pl.'s Dep. at 48-49.)  Apart from failing to even identify which

leg he meant, Plaintiff's statement said nothing about a serious medical issue.  As with

the limp, Plaintiff's statement was generic and ambiguous, and could have conveyed a

variety of meanings.  Not fitting in the seat "because of my leg" might mean his legs

were too long (not likely in this case, since Plaintiff was only about 5' 7"), (Police Report,

Pl.'s Ex. 2), an inability or a difficulty bending the knee or another joint, trouble lifting the

leg from underneath one's own weight, problems with a pant leg or other clothing

caught on an edge, awkward placement of the leg and attendant difficulty negotiating

limited leg room due to the partition, or any number of other things.  Without selecting

from among these options, the court is nonetheless convinced that Plaintiff's ambiguous

statement did not notify Defendants of Plaintiff's vulnerable left femur.[11]  An objectively

reasonable officer in Swan's position would not have known that he was about to apply

a pushing force that would to cause a major bone to snap.  Instead, he saw before him

a young man likely in an unfamiliar situation (police custody) trying to get into an

---

[11]The record, accordingly, does not support the contention made in Plaintiff's
brief that he was forced into the back seat " after he specifically explained the limitations
of his leg," (Pl.'s Br. at 20), or that Swan was "placed on notice of [Plaintiff's] limitations
by plaintiff," (*id.* at 22).

obviously cramped back seat that had limited leg room due to the partition, which is not in a typical back seat, and the presence of his two friends, who were already seated.[12]

The court comes now to the question of the push or shove.  Swan placed both hands upon Plaintiff and applied force to place Plaintiff fully within the back seat. Plaintiff stated that Swan pushed him "[t]o slide me over" and denied any suggestion that Swan was actually trying to hurt him or cause an injury with the pushing.  (Pl.'s Dep. at 54.)[13]  Sanchez testified that he felt the push when Plaintiff's body pressed up against Sanchez, that Swan "shoved [Plaintiff] kind of." He also agreed that Swan never treated Plaintiff angrily.  (Sanchez Dep. at 25.)  Plaintiff opines that Swan was being "a jerk" only because Swan sighed or otherwise expressed disgust with a short verbal outburst, "[t]ch, like a 'huh[,]'" just before he pushed Plaintiff.  (Pl.'s Dep. at 102, 104.) Swan never shrugged his shoulders or made any particular facial expression at Plaintiff. (*Id.* at 102.)

Even if the court were to infer that Swan was disgusted with Plaintiff, a two-handed shove to slide Plaintiff into the cramped back seat was not unreasonable under the circumstances.  As discussed above, Swan had no reason to suspect that Plaintiff's leg was in a precarious condition and that a two-handed shove might snap the leg.

---

[12]Swan avers that, to the best of his knowledge, department policy allowed for transport of three persons in the back seat when two officers are present in the front seat.  (Swan dep. at 15-16, Pl.'s Ex. 4.)

[13]Plaintiff's characterization, in his brief, that Swan "with all the force he could muster, shoved plaintiff sideways into the car[,]" (Pl.'s Br. at 13), therefore finds no support in the record.  This characterization is wholly speculative regarding Swan's strength.  Furthermore, Plaintiff's denial that Swan was trying to injure him clearly implies that if Swan had wanted to injure Plaintiff, he could have applied more force, including "all the force he could muster."  This Swan did not do, according to Plaintiff's sworn testimony.  (Pl.'s Dep. at 54.)

Instead, he had three young men, two of whom were handcuffed and therefore less mobile and seated somewhat awkwardly, to fit in the back seat of a patrol car that had limited leg room due to the partition.  Sliding the weight of Plaintiff, along perhaps with some of the weight of Sanchez and Fortuna, required some level of force.  Swan, who had already experienced difficulty closing the rear door, acted reasonably to take the final step to secure Plaintiff and his companions inside the patrol car.  Under these particular facts, the court must defer to the on-the-spot judgment that Swan made at night on the side of the road about the degree of force reasonably needed to insert Plaintiff and close the back door.  *Burchett*, 310 F.3d at 944.  "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment."  *Graham*, 490 U.S. at 396-97 (quotation omitted).  Under the circumstances, and considering all the relevant factors, the court finds that there is no question of material fact regarding whether Swan acted reasonably.  He did.

The same conclusion is true for Defendant Paraski, whose involvement was much more attenuated.  He also had no knowledge of the condition of Plaintiff's leg.  He therefore had no reason to intervene with Swan's handling of Plaintiff or to warn Swan to handle Plaintiff gingerly.  Furthermore, only a few seconds elapsed between Plaintiff expressing apprehension about getting in because of his leg and Swan shoving Plaintiff. This rapid sequence afforded Paraski no opportunity to intervene, even if he had reason to do so.  Generally, "a police officer who fails to act to prevent the use of excessive force may be held liable when (1) the officer observed or had reason to know that excessive force would be or was being used, and (2) the officer had both the opportunity and the means to prevent the harm from occurring."  *Turner v. Scott*, 119

15

F.3d 425, 429 (6th Cir. 1997) (citing *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir.

1994)).  Neither condition is present in Plaintiff's claim against Paraski.  There is thus no

material question of fact regarding whether Paraski's action or inaction was, under the

circumstances and considering all the relevant factors, reasonable.  It was.

　　　The circumstances of Plaintiff's case are analogous to those of cases alleging

excessive force due to unnecessarily tight handcuffs.  Common characteristics include

no dispute about the reasonableness of the initial seizure but instead argument about

the reasonableness of the force applied to the plaintiff while in custody.  Handcuffing

cases depend to a great extent upon the defendant officers knowing the handcuffs were

too tight and ignoring specific pleas from the plaintiff to that effect while in their custody.

*Lyons v. City of Xenia*, 417 F.3d 565, 576 (6th Cir. 2005) (the plaintiff's case could not

go to the jury because "she does not allege that her physical complaints to the officers

went unheeded"); *Burchett*, F.3d at 944-45 (no excessive force when officers ignored no

plea that handcuffs were too tight and instead acted immediately after the first complaint

to loosen the handcuffs; *Martin v. Heideman*, 106 F.3d 1308, 1310, 1313 (6th Cir.

1997) (reversing directed verdict in favor of defendants when the plaintiff's hands were

actually injured after thirty-five minutes in tight handcuffs despite the plaintiff's ignored

complaints about the tightness of the handcuffs); *Meadows v. Thomas*, 117 Fed App'x

397 (6th Cir. 2002) (finding no excessive force where alleged tightness of handcuffs

resulted in no physical injury and where tightening of handcuffs was due to the plaintiff's

straining or the movement of the police car and not due to action by the officer).

　　　Accordingly, in assessing the viability of an excessive force claim, the court must

be presented with evidence demonstrating that the officer applying force upon a person

16

already in custody had information, such as a specific complaint from the arrestee, from which to know that he was applying too much, i.e. constitutionally unnecessary, force. Analogizing from the handcuffing cases just discussed, had Plaintiff complained before (or, at the latest, as) the force was used something similar to "my leg doesn't work, don't hurt me" or "stop, you're hurting my leg," such a verbalized warning combined with Plaintiff's previously exhibited limp might have been sufficient to conclude that Swan was on notice that he could do serious damage.

However, as explained above, taking the facts as they are, neither Defendant knew or should have known that Plaintiff was being, or about to be, handled too roughly or otherwise needed to be treated more gingerly than a typical seventeen-year-old arrestee. Plaintiff's lack of a *specific* understandable complaint and the resulting absence of meaningful notice for Defendants regarding Plaintiff's vulnerable leg undercut Plaintiff's claim of excessive force.

The court's conclusions concerning the conduct of Swan and Paraski are further supported in light of *St. John*, 411 F.3d 762. In that case, the Sixth Circuit reversed the district court's determination that the arresting officers were entitled to qualified immunity on the plaintiff's excessive force claim. *Id.* at 775. Plaintiff, St. John, suffered from muscular dystrophy and was wheel-chair bound. *Id.* at 765. Importantly, the defendants had responded to St. John's home on a neighborhood trouble call, decided to effect a custodial arrest then and there, and attempted to place him in the back seat of a police car "*after he explained that his legs could not bend.*" *Id.* (emphasis added). The court again emphasized the fact that the plaintiff specifically complained of an inability to bend his legs: "we conclude there are genuine issues of material fact

17

regarding whether [the defendants] acted reasonably when they attempted to place [the plaintiff] in the cruiser even though he complained that his legs would not bend." *Id.* at 771-72.  The court stressed, "it is undisputed that [the plaintiff] explained to the officers that he would not be able to fit in the back seat due to his muscular dystrophy." *Id.* at 772.[14]  The court commented that one of the defendant's arguments was "plainly not responsive to [the plaintiff's] objection to being placed in the back seat. [The plaintiff] informed the officers that he could not fit because his legs would not bend in light of his disability." *Id.* at 773.  The court, viewing the facts in the light most favorable to the plaintiff, concluded that "a reasonable jury could find in his favor on the claim that Defendants used excessive force in attempting to place him in the back seat." *Id.*

*St. John* does not require the same result in this case for at least two reasons. First, Plaintiff, as detailed above, did not notify Defendants of his medical condition.  His observable limp and his ambiguous statement about not fitting in the rear seat "because of [his] leg" did not have the effect of placing Defendants on notice that he should be treated with caution due to his weakened femur.  In contrast, the plaintiff in *St. John* made specific remarks to the defendants about his inability to bend his legs because of muscular dystrophy.  The evidence in *St. John* supported a conclusion that the defendants clearly knew of St. John's condition, ignored his specific pleas and made

---

[14]The plaintiff's affidavit stated the following:
I told the officers that I would not fit in the back seat.  Because of my disability, my legs would not bend.  They paid no attention.  Moreover, Officer Wolfe said that he had bigger men transported in the back seat. So the two officers continued to push with force to have me and my legs inside the cruiser.  As they pushed, moved, turned, and twisted me and my legs, maneuvering me partially into the back seat, my leg got caught between the police cruiser and its back door, causing injury."
*St. John*, 411 F.3d at 772.

18

repeated and sustained efforts to push, twist and otherwise contort the plaintiff's body to fit in the police car.  In this case, Swan did not ignore specific pleas from Plaintiff. There were none.  Rather, Swan in one motion shoved Plaintiff sideways using only the force that a reasonable officer would think was needed in order to slide him over next to his companions.  There is no indication in the record here that more than that degree of force was applied or even intended.  Second, in *St. John* the court noted that "the record does not suggest that exigent circumstances demanded a very speedy arrest of St. John as might be the case where officers needed to proceed quickly to another location or to tend to an injured party." *Id.* at 772.

To the contrary, here the deputies were faced with exigent circumstances requiring "a speedy arrest," i.e., an on-the-spot decision about the disposition of Plaintiff and his back-seat companion, Sanchez.  The driver was obviously not going to be released to drive away.  He was under arrest for a felony.  His Jeep was targeted for impoundment.  It was near midnight.  They were in a rural area.  Something had to be done, and it would be obviously imprudent to leave Plaintiff and Sancez alone by the side of the road.  Defendants' decision to try to put Plaintiff in their rear seat was not objectively unreasonable,[15] and the degree of force used to accomplish that act was

---

[15]   Indeed, the deputies likely had no choice in the matter, and under these circumstances were *obligated* to transport those in custody. In *Davis v. Brady*, 143 F.3d 1021 (6th Cir. 1998), officers, having no room at the county jail, abandoned their drunk-and-disorderly arrestee on a "forlorn" and unfamiliar rural highway after dark, and the arrestee was later hit by an automobile.  *Id.* at 1023-24, 1026.  The Circuit Court rejected a qualified immunity claim that there was no clearly established right for arrestee not to be abandoned once in custody.  *Id.* at 1026-27.  While Defendant officers claimed that Plaintiff had sobered up and had requested release in that area, Plaintiff's claim that he was still intoxicated and that the officers acted to "teach [him] a lesson" had to be credited for purposes of Rule 56 analysis.  *Id.* at 1023, 1026-27.

likewise within the range of reason. The resulting injury was, needless to say, alarming and regrettable.  But it was neither reasonably foreseeable nor the result of any unconstitutional application of force by the Defendants.

### B. Gross Negligence under Michigan Law

The court has discretion to exercise jurisdiction over Plaintiff's state law claim.  A district court may decline to exercise jurisdiction over claims allowed in federal court pursuant to subsection (a) if "the district court has dismissed all claims over which it has original jurisdiction[.]" 28 U.S.C. § 1367(c)(3).  The court, pursuant to the above analysis, has dismissed all claims in this case over which it had original jurisdiction.  The court will, in the interests of judicial economy, reach Plaintiff's remaining claim of gross negligence under state law.

It is apparent, based on the above analysis under § 1983, that Defendants did not act with gross negligence.  Michigan law defines gross negligence as "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results." Mich. Comp. Laws § 691.1407(2).  Based on the court's determination that there is no question of fact regarding the reasonableness of Defendants' actions, Plaintiff could not possibly meet the higher standard of presenting a question of fact regarding gross negligence.

### VI.  CONCLUSION

IT IS ORDERED that Defendants' "Motion for Summary Judgment" [Dkt #18] is GRANTED as to Counts I and IV.  Upon the stipulation of the parties, Counts II and III are DISMISSED.

      s/Robert H. Cleland

ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE

Dated:  November 29, 2006


I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, November 29, 2006, by electronic and/or ordinary mail.

 s/Lisa Wagner
Case Manager and Deputy Clerk
(313) 234-5522

S:\Cleland\JUDGE'S DESK\C2 ORDERS\05-74934.TODHUNTER.SJmotion.2.wpd